

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00022-CR

_____

BENNIE LOUIE EDWARDS, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 78th District Court
Wichita County, Texas
Trial Court No. 58,404-B

Before Kerr, Birdwell, and Wallach, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

## I. INTRODUCTION

A jury convicted Appellant Bennie Louie Edwards of possession with the intent to deliver a controlled substance, i.e., cocaine, in an amount of four grams or more but less than two hundred grams, a first-degree felony. *See* Tex. Health & Safety Code Ann. § 481.112(d). After finding the enhancement paragraph true, the jury assessed Edwards's punishment at 60 years' imprisonment and a $7,500 fine. *See* Tex. Penal Code Ann. § 12.42(c)(1). The trial court sentenced Edwards in accordance with the jury's verdict. The judgment correctly reflects the jury's verdict and the trial court's sentence.

On appeal, Edwards raises three issues:

1. Was there legally sufficient evidence to prove that [he] knowingly possessed a controlled substance?

2. Under . . . *Rhode Island* [*v. Innis*], interrogation *is any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.* While [Edwards was] in custody and without being [given his *Miranda*[1] warnings], an arresting officer engaged in a spirited political debate with [him] and eventually obtained incriminating admissions. The trial court found the interaction was not an interrogation and admitted the admissions[;] was this an error?

---

[1]*Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966) ("Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.").

3. Did the trial court err in refusing to submit to the jury a lesser[-]included offense instruction on possession of a controlled substance less than one gram?

We hold that (1) the evidence was legally sufficient to show Edwards knowingly possessed the controlled substance; (2) the trial court did not err by finding that there was no interrogation; alternatively, assuming Edwards's admissions were the product of an interrogation, any error was harmless because comparable evidence came in elsewhere; and (3) the trial court did not err by refusing to submit a lesser-included instruction in the jury charge. We overrule all three issues and affirm the trial court's judgment.

## II. THE EVIDENCE

### A. The Surveillance

Officer Dylan Dilbeck testified that he had information that led him to believe that Edwards was selling drugs from his residence on Patterson Street in Wichita Falls. During surveillance, Officer Dilbeck observed Edwards leave his house, walk to a red Cadillac in the lot next door, open the Cadillac's trunk, shut the trunk, and walk back into his residence.[2] Officer Dilbeck said that he suspected that Edwards was retrieving narcotics from the Cadillac and proceeded to obtain a search warrant for the Patterson residence and the lot next door.

---

[2]Various witnesses described the Cadillac as maroon or red. Regardless, they were referring to the same Cadillac. For the sake of simplicity, we refer to it as the red Cadillac.

3

Officer Tye Davis joined Officer Dilbeck in conducting surveillance. Officer Davis also described what he observed:

> Officer Dilbeck was driving. I was a passenger in his vehicle. . . . [H]e was going to a location on Patterson Street [to] conduct surveillance. In doing so, we sat there. We watched . . . a person approach the residence[ and] go inside. . . . Mr. Edwards exited the residence[ and] walked across the front of the property to a red Cadillac that was parked just adjacent to the residence. From my point of view, all I could see . . . was the front of the vehicle, and then the trunk popped open in the rear of the vehicle. He was out of sight for approximately 30 seconds. The trunk closed[,] and he took the same path back from the vehicle across the front yard back into the residence. And then within a couple of minutes, the person that was inside the residence that just showed up prior to him going to the Cadillac exited the residence and walked off.

## B. The Search

After procuring a search warrant, Officer Dilbeck conducted a search on August 19, 2016. When he and other officers arrived, a vehicle in the vacant next-door lot took off at a high rate of speed, so Officer Dilbeck stopped it. Inside that vehicle, Officer Dilbeck found a large quantity of marijuana. Officer Dilbeck detained both occupants of the vehicle.

By the time Officer Dilbeck returned to the house, the other officers had detained the six people inside the house. Edwards was one of the six.

Officer Davis was also present for the search. He searched Edwards and found a wallet and two sets of keys. The wallet contained close to $1,000. Officer Davis did not find any narcotics on Edwards.

4

When searching the house, Officer Dilbeck found on the south living room floor a pill bottle containing crack cocaine and preserved it as evidence. In the north living room, he found a digital scale used to weigh narcotics; a grinder for marijuana; a razor blade used for cutting drugs; and cigars, which Officer Dilbeck testified are "commonly used to be cut open to put marijuana inside." In the kitchen on top of a microwave, Officer Dilbeck found another razor blade with crack-cocaine residue.

Similarly, when Officer Davis entered the kitchen, he saw a microwave on the counter, and on top of the microwave was a razor blade and a white powdery substance. Officer Davis said that a very common method of converting cocaine into crack cocaine was to mix baking soda with water and cocaine and then warm it up in a microwave. He explained, "A lot of time[s] they [mix it] on top of the microwave," and he added, "It doesn't make sense to prepare it in the living room, bring it back to the kitchen[,] and cook it. It's all done there in the preparation area." He concluded, "So when I [saw] the razor blade, the powdery substance[,] and the smear on top of the microwave, it was indicative to me of someone's converting cocaine to crack or at least [this was a] place . . . where cocaine [was] converted to crack[ ]cocaine."

Inside the purse of Edwards's girlfriend, Dorothy Green, another officer found a pill bottle and a baggie. Both contained crack cocaine. Edwards was not charged with the crack cocaine found in Green's purse.

Officer Dilbeck also found a letter addressed to Edwards with the Patterson address on it. The letter confirmed Officer Dilbeck's belief that the Patterson address

was Edwards's residence. Officer Dilbeck further determined that one of the keys found on Edwards's keychains opened the front door of the Patterson residence.

Using another key from one of Edwards's keychains, Officer Dilbeck was able to open the trunk of the red Cadillac in the vacant lot next door to Edwards's residence. Officer Davis searched the Cadillac. He testified,

> A. . . . When I unlocked the trunk [of the Cadillac], it popped open. There [were] some golf clubs[ and] like an art make-up kind of blue box, and . . . I opened it up. Inside that, I found a green leafy substance I suspected was marijuana.

> Q. Okay.

> A. And then there was also a white bottle loose in the trunk of the Cadillac I picked up, and when I did, it kind of rattled. And when I opened it up and looked inside, I could see off-white chunks. Just, immediately, I suspected it to be crack[ ]cocaine.

Officer Davis found no other keys that would open the Cadillac's trunk.

At the scene, Officer Dilbeck weighed the drugs found in the Cadillac and determined that they weighed about 5.34 grams. The drugs found in the south living room weighed 1.14 grams. Based on Officer Dilbeck's experience, that was a large amount of crack cocaine. He explained that a single use of crack cocaine might weigh half a gram. In his experience, when he found a quantity of over four grams of crack cocaine, that indicated to him that the person was selling it. For personal use, having over four grams of crack cocaine would be unusual. He sent the drugs to a laboratory to be tested.

Officer Davis gave comparable testimony. He said finding someone in possession of over four grams of crack cocaine suggested to him that the person was a supplier and not a user. According to Officer Davis, users typically had only two-tenths of a gram.

The path from the residence to the Cadillac, Officer Dilbeck noted, was worn. That indicated to him that someone had gone to the back of the Cadillac several times.

Officer Dilbeck stated that after Edwards had been detained, Edwards asked him a question regarding why he was being arrested: "Bennie asked me . . . what he was going to jail for. And I explained to him he was going for the cocaine found in the house and the Cadillac. And Mr. Edwards . . . screamed at me[;] he said, [']You can't charge me with that. I don't even own that Cadillac.[']"

Edwards's voicing concerns about being charged with anything found in the Cadillac did not end with Officer Dilbeck; he resumed later with Officer Davis.

## C.  The Jail

From his home, Edwards was taken to the jail. Officer Davis acknowledged at trial that once at the jail, Edwards was under arrest and, further, that he had not given Edwards any *Miranda* warnings. Whether anyone else had given Edwards the *Miranda* warnings, Officer Davis did not know.

At the jail, while Officer Dilbeck processed other persons whom the police had arrested,[3] Officer Davis sat with Edwards in the holding area. Officer Davis explained that the arrestees could not be left alone in the holding area while the arresting officer processed other arrestees; because Officer Dilbeck could not be in two places at once, Officer Davis sat in the holding area with the other arrestees. Officer Davis explained what happened next:

Q. And did you sit in silence or did y'all discuss stuff?

A. No, we . . . actually had a good conversation, or at least I enjoyed it. It was a time in politics where there was a lot of talk about it in the news. And Mr. Edwards and I engaged in a plethora of conversation regarding politics and other things. . . .

. . . .

Q. . . . Is it correct you were . . . basically making small talk or discussing some kind of things that weren't relevant to this case with the defendant, Bennie Edwards; is that correct?

A. Yes, sir, inside the jail holding area.

Q. Okay. And you mentioned there was some political talk?

A. Yes, sir.

_____

[3]Officer Dilbeck arrested at least one person in the car that had sped away when the police arrived. He arrested that person for possession of marijuana. The police also arrested Green. The record does not show whether the police arrested the second person in the car or the other four individuals in the house. Officer Davis seemed to indicate that no one else was arrested: "Mr. Edwards and two other individuals from this case were inside the book-in." On the other hand, Officer Davis said that other officers were present too. Whether this meant that other officers with other arrestees were present as well is not clear. One comment Officer Davis made suggested there were not a lot of other arrestees to process: "It was a slow day at the jail."

Q. And this was August[] 2016. Was that in the midst of a presidential election?

A. Yes, sir.

Q. Okay. Was that kind of the focus of some of this talk?

A. Yeah, that was . . . basically the gist of . . . most of the small talk.

Q. And about how long were y'all talking, all together?

A. It could have been upwards to two hours.

Q. Okay. And was it your intention during this conversation to try to elicit any incriminating statement from the defendant?

A. It was not.

Q. At some point during this conversation, did Mr. Edwards ask any questions or make any statements relevant to the charge before us today?

A. Yes.

Q. Okay. What did he ask you related to that?

A. He . . . started out asking about the Cadillac that was on the property adjacent to his residence or where he was living and how did we—"we" meaning law enforcement—come to be able to search that vehicle.

Q. And did you answer that question?

A. Yes, I did.

Q. What did you say to him?

A. I told him that I had conducted surveillance on the property and watched him go to that vehicle during a drug transaction.

9

Q. And did he have a response to that or any additional questions for you?

A. Yes. He asked me did I see him sell drugs, to which I replied, ["]Yes.["] And then he was very adamant, ["]That's a lie,["] and said that he does not sell—His answer was, ["]Yes, I don't sell drugs out in the open.["]

Q. Okay. So he was saying that you were lying about seeing him selling drugs because he does not sell drugs out in the open?

A. Yes.

Q. Okay. And was there any other talk or did he say anything else about the trunk of that Cadillac or the Cadillac, in general?

A. Yes. . . . His reasoning for going to the Cadillac[—]he stated that he was going[—t]he reason he went to the Cadillac to get in the trunk was to check on a set of golf clubs that were in the trunk.

Q. All right. And did that statement strike you as strange in any way?

A. It did in the fact that up until this time, with me speaking with him, I'd never mentioned anything to him about golf clubs being in the trunk. So, as I took it, . . . I know that during the surveillance, I'd watched him go to [the] trunk, and . . . the fact that he went to the trunk and knew what some of the contents were.

Q. And it may be a bit of a silly question, but . . . the statement, ["]That's a lie; I don't sell drugs out in the open[."] . . . [W]hat did you take that to mean?

A. I remember in that moment thinking . . . when he asked me the question and I replied, ["]Yes,["] . . . I was thinking about . . . what I considered to be part of a drug transaction . . . that I described earlier[—]someone walking up to the house, him walking to the Cadillac, there for 30 seconds, going back to the house and that person leaving[—]that was, to me, selling dope. I mean, . . . in my opinion, at that moment, he was thinking, ["]Well, you didn't see me put it in

10

someone else's—in their hands, so therefore that transaction, you didn't see that.["] So he was probably more macro in that moment, where I was thinking more of this. So when he said I was lying, I kind of understood what his perspective was and just let it go. I wasn't trying to convince. I just was stating what I observed.

Q. And the part of the statement where he says, ["]I don't sell drugs out in the open,["] what . . . did you infer from that?

A. Well, part of what I observed would happen inside the residence and that his meaning was he's selling from inside the house, not where he could be seen from someone such as myself doing surveillance.

Q. Okay. So he didn't just say, ["]I don't sell drugs["]?

A. That is correct.

On cross-examination, the following occurred,

Q. Okay, and during your surveillance, you saw somebody come up to [the] Patterson [address and] go in the house?

A. Yes, sir.

Q. Okay, and then you saw Mr. Edwards go to the Cadillac?

A. Yes, sir.

Q. And go back to the house?

A. Yes, sir.

Q. And there were golf clubs in that trunk of that Cadillac, weren't there?

A. There were.

Q. You don't know what took place inside the house?

A. I do not.

11

On redirect-examination, the prosecutor continued,

Q. Asking about that surveillance again, you said you saw someone go into the residence at [the] Patterson [address]. How long did that whole event take? From the defendant going out to the Cadillac then back to the house, and then that person who had just entered the residence leaving, do you have an estimate about how long that took?

A. An estimate of maybe five minutes.

Q. Okay. Based upon your training and experience, did you form an opinion at that time about what was taking place in that residence?

A. Yes, sir. Yes.

Q. And what was that opinion?

A. A drug transaction.

On recross-examination, defense counsel asked,

Q. Do you know who owned the [red] Cadillac?

A. No, sir.

Q. Did you run the tags?

A. I did not.

## D. Edwards's Recorded Telephone Conversations

The State introduced two recordings of Edwards's telephone conversations from jail. We address each in turn.

### 1. First Recorded Conversation

In the first one, State's Exhibit 29, Edwards indicated to his bondsman that he could use a Cadillac to obtain a bond. After Green joined the call, Edwards asked her

12

if she had the keys to the Cadillac, and she responded that she did but that she could not get it started. Edwards then asked Green if she had gotten "the thing" out of the back, and she answered that she had taken it out of the trunk. Green then explained to Edwards that she had taken the red Cadillac[4] for her own bond. Still later, Edwards and Green discussed where they had put the title to the Cadillac.

## 2. Second Recorded Conversation

In the second recorded conversation, State's Exhibit 30, Green informed Edwards that she could not find the keys or the title to a gray Cadillac. She had, however, found the title to the red Cadillac and had used the red Cadillac to get herself out of jail. Green told Edwards that she had not yet driven the red Cadillac to the bondsman. Edwards informed Green that the red Cadillac was out of gas.

In this second recorded conversion, we learn that "the thing" removed from the trunk and referred to in the earlier conversation was a "piece."[5] Edwards and Green later discussed something else inside the house that the police did not find; Edwards chuckled, and Green expressed relief.

Eventually Green told Edwards that there was an informant, but Edwards was initially dubious because, as he explained to Green, he did not sell to people that he did not know. When Green insisted and pointed out that the informant had seen

_____

[4]Green referred to it as the "red car," not the "red Cadillac." We refer to it as the red Cadillac for consistency.

[5]One definition of a "piece" is a firearm. Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/piece (last visited Aug. 2, 2023).

Edwards go to the red Cadillac, Edwards responded that going to a car did not mean that he owned that car and, besides, he was selling for other people, so anything found inside the cars did not mean that those things were his. Eventually, Edwards warmed up to the idea that an informant had been involved.

## E. The Cocaine

A forensic scientist determined that the substance found in the trunk of the Cadillac was cocaine and that, without any packaging, it weighed 4.34 grams. The forensic scientist further determined that the substance found in a pill bottle inside the Patterson residence was also cocaine and weighed 0.63 grams.

## F. Edwards's Witnesses

Edwards called three witnesses. The gist of their testimony was that he did not own the red Cadillac and that he was just helping the owner sell it.

### 1. Culberson

Worth Culberson Jr. testified that he came into possession of the red Cadillac after it had broken down, so he had it towed to a lot on Patterson. The owner of the Cadillac eventually sold it to Culberson to pay off a debt she owed him, but he left the car in the lot on Patterson. Culberson did not know who owned the lot on which he stored the Cadillac; all Culberson knew was that the lot was some place where he could store cars. He explained that Edwards had told him that it would be okay for him to store cars there.

14

Culberson had a set of keys to the car, and he lent the keys to someone so that the person could look at it, but Culberson did not remember getting the keys back. Culberson explained that he had extra keys made so that people could look at the car, but, he added, the keys would not start the car; starting the car required a key with a chip. Culberson said that it would not surprise him if Edwards had keys to the Cadillac because when the wrecker towed a car to the lot, the driver of the wrecker would typically leave the keys to it with the person at the location.

Regarding the nature of Culberson's relationship with Edwards, Culberson stated that Edwards was someone with whom he did car business. Culberson denied personally storing drugs in the Cadillac. When asked if finding drugs in the Cadillac would surprise him, Culberson said it would not. But storing drugs in the Cadillac, he added, "would be kind of stupid."

Culberson stated that in August 2016, Green contacted him and asked if she could put up the Cadillac for her bond. To the best of Culberson's knowledge, he had never sold the Cadillac. According to Culberson, he agreed to help Green, and one of her children came by to pick up its title.

## 2. Maxxie

Maxxie Green[6] owned A to Z Bail Bonds.

---

[6]Maxxie Green and Dorothy Green share the same surname. To distinguish between the two, we refer to Maxxie Green by his first name.

15

### a. Edwards's bond and the grey Cadillac

Maxxie made Edwards's bond in August 2016. As collateral, he took the titles to a grey Cadillac and a Nissan pickup. Edwards made bond payments, and eventually Maxxie returned the grey Cadillac and Nissan to Edwards; Maxxie, however, retained the titles.

### b. Green's bond and the red Cadillac

Maxxie also handled part of Green's bond, and as collateral, he took a red Cadillac—the one depicted in the State's exhibits. Someone had driven the car to his office, but it leaked water and overheated. Maxxie took the title to the red Cadillac too. He returned the car at some point. Maxxie denied storing anything in the Cadillac.

## 3. Lindsey

Tony Lindsey lived next door to Edwards in August 2016. He remembered August 19, 2016; that was the day the police were next door. On direct examination by defense counsel, Lindsey described what he saw not only on August 19 but on many other days preceding it:

Q. (Indicating) I'll show you what's been previously admitted as State's Exhibits 17 and 18. Is that the red car you're talking about?

A. Yes.

Q. Does that look familiar to you[?]

A. Yes.

Q. And is that the lot next to [Edwards's residence on] Patterson?

A. Yes.

Q. Okay. And, again, what did you see that morning?

A. . . . Basically[,] every day, someone different was going in it, and they had a key to it because they would open the doors, the trunk. They would sit in it.

Q. Okay. Did you find that unusual?

A. Well, at first, but then, you know, it just happened over and over every day, and so—

Q. Did you ever report that to Mr. Edwards?

A. I think we may have spoke[n] on it the first time. That's when he was saying something about Sonny Boy. Sonny Boy was—

THE REPORTER: Saying something about who?

THE WITNESS: Sonny. Sonny Boy. That's what I call him. I don't—

Q. (By [defense counsel]) Was Sonny Boy here today in court?

A. Yes.

Q. Would that have been Worth Culberson?

A. Yes.

Q. . . . Especially the morning of the day the police showed up, you saw two people at—

A. Yeah.

Q. —in the car?

A. Yeah.

17

Q. Can you describe them?

A. No. Actually, I didn't pay really no attention because, like I say, you know, people [were] there. It became, you know, a normal thing.

Q. How old were they?

A. I can't—You know, I can't—

Q. Okay. Were they Mr. Edwards?

A. I think so.

Q. One of them was Mr. Edwards?

A. Yes.

. . . .

Q. [By prosecutor on cross-examination] When you saw people go into this vehicle, did you see them go in while you were sitting inside your house or outside your house?

A. I was leaving the house going for a walk. I walk every day and every evening.

Q. . . . I guess when you were going on these walks is when you saw people—

A. Yeah, that's when I . . . would notice, you know, that side of the . . . block—

Q. Did you—

A. —is when I'm out walking.

Q. Did you find that behavior odd, Mr. Lindsey?

18

A. Only at first. They were standing by the cars, you know, buying them or something—somebody buying them. They were storing them for someone, something to that effect.

### III.  SUFFICIENCY CHALLENGE

In Edwards's first issue, he questions whether the evidence was sufficient to prove that he knowingly possessed a controlled substance. We hold that the evidence was sufficient.

### A. Standard of Review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021). The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592,

608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton*, 569 S.W.3d at 608.

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Carter v. State*, 620 S.W.3d 147, 149 (Tex. Crim. App. 2021), *cert. denied*, 142 S. Ct. 859 (2022). We must scrutinize circumstantial evidence of intent as stringently as other types of evidence. *Laster v. State*, 275 S.W.3d 512, 519–20 (Tex. Crim. App. 2009). When the record supports conflicting inferences, a reviewing court must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution and must defer to that resolution. *Petetan v. State*, 622 S.W.3d 321, 337 (Tex. Crim. App. 2021).

## B. Legal Principles

"'Possession' means actual care, custody, control, or management." Tex. Health & Safety Code Ann. § 481.002(38). The elements for possession of a controlled substance with intent to deliver are that the defendant

- possessed a controlled substance in the amount alleged;

- intended to deliver the controlled substance to another; and

- knew that the substance in his possession was a controlled substance.

*Figueroa v. State*, 250 S.W.3d 490, 500 (Tex. App.—Austin 2008, pet. ref'd).

Circumstantial evidence of possession should not be analyzed in isolation but should be viewed in its totality to determine if there is sufficient evidence connecting the defendant to the actual care, custody, or control of the drugs at issue. *Medina v. State*, 555 S.W.3d 581, 589–90 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). The question is whether the logical force of the combined circumstantial evidence when coupled with reasonable inferences from that evidence is sufficient to establish beyond a reasonable doubt that the defendant exercised actual care, custody, control, or management of the drugs seized. *Id.* at 590. When the defendant is not in exclusive possession of the place where the drugs are found, his knowledge of and control over them cannot be established unless additional independent facts and circumstances link him to the contraband. *Figueroa*, 250 S.W.3d at 500.

## C. Discussion

The evidence showed that the Patterson address was Edwards's residence. For example, Lindsey said that he lived on Patterson next door to Edwards. Police found a letter addressed to Edwards with the Patterson address on it inside the home. Finally, Edwards possessed a key to the front door.

Not only did the evidence show that the residence was Edwards's, but Edwards himself was present when the police found the drugs. Police also found in plain sight general drug paraphernalia, such as scales, and other drug paraphernalia linked

21

specifically to making crack cocaine, such as a razor blade and a white powdery substance on top of a microwave.

And although other people were in the house when the police conducted the search, Edwards was the only person that the police saw leave the residence shortly after a visitor arrived there, and Edwards was the person that the police saw trek to the Cadillac, open its trunk—a trunk in which the police found more cocaine—and trek back to the house. Shortly after which, the police saw the visitor leave. Regardless of the status of the other people found inside the house, Edwards was the person whom the police saw behave in a manner consistent with drug dealing.

Regarding the cocaine found in the trunk of the Cadillac, what the police found in the trunk was Edwards's primary concern when he was arrested—as shown by his protest to Officer Dilbeck—and when he was sitting in the holding area—as shown by the questions he asked Officer Davis and by his response to Officer Davis's answers. A rational factfinder could have reasonably concluded that a person who had no link to or knowledge of the contents of the Cadillac's trunk would lack the awareness to voice a protest about anything the police had found therein. Similarly, a rational factfinder could have reasonably concluded that a person who knew what was in the Cadillac's trunk and who feared that the police were attributing its contents to him would be keen to know how the police were making that connection. Edwards's conduct was the latter; he was keen to know how the police were tying the drugs in the Cadillac's trunk to him.

Although the testimony suggested other keys to the Cadillac and its trunk existed, Edwards was the only person at the scene who possessed such a key. And regardless of who else might have possessed a key, Edwards was the only person whom the police observed opening the Cadillac's trunk.

To the extent that Edwards relies on another's possession of title to the Cadillac, who held title to it was not clear. But at the relevant times, only Edwards exercised access to the Cadillac and its interior. Edwards was thus the person who had actual care, custody, control, or management of the Cadillac and its trunk. *See* Tex. Health & Safety Code Ann. § 481.002(38).

Regarding Edwards's explanation to Officer Davis that he was checking on the golf clubs in the Cadillac's trunk, the jury did not have to believe that explanation. *See Jackson v. State*, 617 S.W.3d 916, 923 (Tex. App.—Houston [14th Dist.] 2021, no pet.) (stating that the factfinder is entitled to believe or disbelieve all or part of a witness's testimony even if that testimony is uncontroverted). Here, if Edwards were that concerned about the golf clubs' security, a rational factfinder could have reasonably concluded that Edwards would have stored them in his house and not in the trunk of a Cadillac parked in a vacant lot. In any event, Edwards's knowledge that golf clubs were in the trunk—regardless of the explanation—showed that he had possession of the Cadillac.

Although no one saw or found Edwards with the drugs on his person, the cumulative force of the circumstantial evidence was more than enough for a rational

23

juror to reasonably find beyond a reasonable doubt that the drugs found inside the house and in the Cadillac's trunk were Edwards's. *See Queeman*, 520 S.W.3d at 622; *Medina*, 555 S.W.3d at 589–90. We thus hold that the evidence was sufficient to support the possession finding.

We overrule Edwards's first issue.

## IV. INTERROGATION

In Edwards's second issue, he argues that the trial court erred by finding that his statements to Officer Davis in the holding area were not in response to an interrogation. More specifically, Edwards asserts that Officer Davis should have known that his interactions with him were reasonably likely to elicit an incriminating response. We hold that the trial court did not err by finding there was no interrogation. In the alternative, we hold that any error was harmless because comparable evidence came in elsewhere.

### A. Standard of Review

An appellate court reviews a trial court's ruling on the admission of evidence under an abuse-of-discretion standard. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019); *Daniels v. State*, No. 10-18-00075-CR, 2019 WL 4721276, at *1 (Tex. App.—Waco Sept. 25, 2019, no pet.) (mem. op., not designated for publication). A trial court abuses its discretion when it acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably. *Rhomer*, 569 S.W.3d at 669; *Daniels*, 2019 WL 4721276, at *1.

24

**B. Legal Principles**

*Miranda* warnings are required only when the defendant is in custody and there is an interrogation. *State v. Ortiz*, 382 S.W.3d 367, 371 n.13 (Tex. Crim. App. 2012). "Interrogation" encompasses words or acts that the police should know are reasonably likely to elicit an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 1689–90 (1980). This definition focuses primarily on the suspect's perceptions rather than the police's intent. *Id.*; 100 S. Ct. at 1690.

To qualify as an "interrogation," there must be a measure of compulsion. *Id.* at 300; 100 S. Ct. at 1689. Thus, even when the accused is in custody, volunteered statements are not barred by *Miranda*. *Pugh v. State*, 624 S.W.3d 565, 568 (Tex. Crim. App. 2021). Furthermore, an officer's response to a question from someone in custody does not amount to an interrogation. *United States v. Crisolis-Gonzalez*, 742 F.3d 830, 837 (8th Cir. 2014). Isolation and intimidation are "key aspects of an interrogation that undermines an individual's ability to speak voluntarily." *Daniels*, 2019 WL 4721276, at *1 (citing *Miranda*, 384 U.S. at 449–51, 86 S. Ct. at 1615–17, and holding that there was no interrogation because there was no isolation or intimidation). When a defendant initiates a conversation about the facts of an offense, generally no interrogation occurs. *See Vasquez v. State*, No. 14-01-01018-CR, 2003 WL 60518, at *2 (Tex. App.—Houston [14th Dist.] Jan. 9, 2003, pet. ref'd) (mem. op., not designated for publication).

## C. Discussion

According to Officer Davis, he and Edwards were essentially killing time while they waited for Officer Dilbeck to process the other arrestees and, eventually, to process Edwards himself. The record did not show whether the two hours they spent in the holding area was an inordinate time to wait. The record did not show how many other persons had to be processed or how long processing someone typically took. Nothing suggested that Officer Dilbeck deliberately processed the other arrestees first to give Officer Davis more time with Edwards. And nothing in Officer Davis's description of his and Edwards's interaction suggested that intimidation was involved.

Officer Davis's testimony showed that Edwards wanted to know what Officer Davis knew about his arrest and anything found in the Cadillac's trunk—essentially Edwards, not Officer Davis, was the person doing the interrogating. Officer Davis did not go beyond answering Edwards's question. Nothing suggested that Officer Davis sought to encourage Edwards to talk about the offense. Anything that Edwards said in response to Officer Davis's answers was, thus, voluntary. We conclude that the trial court did not abuse its discretion by concluding that Edwards was not interrogated. *See id.*

Even assuming the interaction constituted an interrogation, we hold that the error, if any, in admitting the evidence was harmless. *See* Tex. R. App. P. 44.2. During the second recorded telephone conversation from jail, Edwards admitted

26

selling without specifying what it was he was selling. He also admitted that whatever he was selling out of the cars, he was—essentially—selling on commission. Even with constitutional error, admitting evidence erroneously is harmless when the disputed evidence is cumulative of other evidence admitted at trial. *See Lopez v. State*, 615 S.W.3d 238, 265 (Tex. App.—El Paso 2020, pet. ref'd).

We overrule Edwards's second issue.

## V. LESSER-INCLUDED-OFFENSE INSTRUCTION

In Edwards's third issue, he contends that the trial court erred by not submitting an instruction in the jury charge on the lesser-included offense of possession of a controlled substance of less than one gram. The net weight of the cocaine found in Edwards's home was 0.63 grams. Possession of less than one gram of cocaine is a state-jail felony. *See* Tex. Health & Safety Code Ann. § 481.115(b). Edwards contends that the charge should have permitted the jury to convict him, if at all, only for possessing the cocaine found in his home.

Edwards specifically requested such an instruction. The trial court denied his request.

Despite Edwards's request and the trial court's denial of that request, the State argues that he did not adequately preserve this issue because he did not explain why he thought that he was entitled to the jury instruction. *See Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012). We are not persuaded.

27

We note that the charge contained an instruction on a lesser-included offense (but not the one at issue here) of the greater offense, i.e., it contained an instruction on both possession with intent to deliver four grams or more but less than two hundred grams of cocaine and possession (without the intent to deliver) of four grams or more but less than two hundred grams of cocaine. On the greater amount of cocaine, the parties had thus agreed that possession alone was a possibility.

Underscoring this point, at the charge conference, the State conceded on the record—at least for the drugs found in the car (and for the drugs found in both the car and the house together)—that this might be only a possession case, but it argued against allowing a possession-only instruction for the drugs found in the house standing alone. The State did not, however, articulate a basis for this distinction.[7]

In any event, the trial court was not called upon to rule on whether the possession-only instruction for the drugs found in the car (and for the drugs found in both the car and the house together) was proper. The only disputed instruction was on whether Edwards was entitled to a possession-only instruction for the drugs found inside the house. The trial court denied that request.

---

[7]Specifically, the State argued,

Your Honor, I would object to that request and those proposed instructions. I believe the evidence that has been put on would tend to show that if the defendant was in possession of any drugs, it would have been the drugs in the car, and, possibly, in addition to that, the drugs in the house, but I don't believe any evidence has been put on that would tend to show that the defendant was in possession of just the drugs in the house. For that reason, I would object to those instructions.

28

For our purposes, we conclude that "the specific grounds were apparent from the context," *see* Tex. R. App. P. 33.1(a)(1)(A), and that Edwards's issue is thus adequately preserved. However, for the following reasons, we hold that the trial court did not err in denying his request for another lesser-included-offense instruction.

## A. Standard of Review

Error in the charge, if timely objected to in the trial court, requires reversal if the error was "calculated to injure the rights of [the] defendant," which means no more than that there must be *some* harm to the accused from the error. Tex. Code Crim. Proc. Ann. art. 36.19; *Abdnor v. State*, 871 S.W.2d 726, 732 (Tex. Crim. App. 1994); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see also Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013). In other words, a properly preserved error, unless harmless, requires reversal. *Almanza*, 686 S.W.2d at 171. But if no error occurred, our analysis ends. *Knight v. State*, 504 S.W.3d 524, 527 (Tex. App.—Fort Worth 2016, pet. ref'd).

## B. Legal Principles

An appellate court applies a two-step test when reviewing a trial court's decision to deny a lesser-included-offense instruction. *Hernandez v. State*, 631 S.W.3d 120, 123 (Tex. Crim. App. 2021). The first step asks whether the lesser offense is included in the charged offense as a matter of law. *Id.* The second step asks whether some evidence in the record would have permitted a jury to rationally find that if the

29

defendant was guilty, he was guilty only of the lesser offense. *Id.* Put differently, the lesser offense must be a valid, rational alternative to the charged offense. *Id.*

Although the threshold for showing the second step is low, it is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense; rather, some evidence directly germane to the lesser-included offense must be present for the factfinder to consider before an instruction on a lesser-included offense is warranted. *Sweed v. State*, 351 S.W.3d 63, 68 (Tex. Crim. App. 2011). When determining whether a defendant is entitled to a lesser-included-offense instruction, reviewing courts consider the facts in the light most favorable toward submitting the instruction. *Bufkin v. State*, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006). Reviewing courts consider the requested instruction in the context of the entire evidentiary record. *Hall v. State*, 158 S.W.3d 470, 473 (Tex. Crim. App. 2005).

## C. Discussion

### 1. First Step

The parties do not dispute that Edwards meets the first step. Both parties treat the testimony as describing one incident with a greater offense and lesser-included offenses. *See Bufkin*, 207 S.W.3d at 784. Neither party contends that the drugs found inside the house constituted a separate offense. *See Campbell v. State*, 149 S.W.3d 149, 155–56 (Tex. Crim. App. 2004).[8] Accordingly, depending on the facts, Edwards was

---

[8]To the extent that Edwards suggests that the drugs found in his house constituted a separate, distinct offense, he would not be entitled to the denied

potentially eligible for an instruction on the requested lesser-included offense. *See Bufkin*, 207 S.W.3d at 784.

## 2. Second Step

We note that in the indictment, the State did not distinguish between the cocaine found in the house and the cocaine found in the Cadillac; the State simply alleged that Edwards possessed four grams or more but less than two hundred grams of cocaine with the intent to deliver. Whether the total amount was 4.34 grams (the amount found in the Cadillac's trunk) or 4.97 grams (the combined amount found in the trunk and inside the house) made no difference. For weight purposes, the drugs found inside the house were a moot issue unless the jury first determined that Edwards did not possess the drugs in the Cadillac's trunk. On the other hand, the drugs inside the house supported—but were not necessarily essential to—the State's theory that Edwards used the Cadillac and his house together to sell drugs.

Edwards asserts that the police testified that although they found cocaine on the floor and in Green's purse inside the house, they said that they were going to charge him only for the cocaine found on the floor. Edwards contends this testimony constitutes affirmative evidence that he might have been guilty of possessing only the

---

instruction. *See Campbell*, 149 S.W.3d at 155–56. As the Texas Court of Criminal Appeals recently stated, "Separate offenses are not included offenses." *Hernandez*, 631 S.W.3d at 125. Because such an argument would be self-defeating, we do not understand that to be his contention.

drugs found inside the house. After reviewing the record reference to which Edwards cites, we are not persuaded that is what the police said.

Officer Dilbeck testified that the police did not charge Edwards for the cocaine found in Green's purse. Officer Dilbeck said nothing about charging Edwards exclusively for the cocaine found on the floor.[9] Nor did Officer Dilbeck say anything suggesting that he was thinking of charging Edwards only with a possession offense. Both Officers Dilbeck and Davis testified that their surveillance indicated to them that Edwards was dealing drugs. To deal drugs, Edwards had to possess them. The officers confirmed their belief that Edwards was dealing drugs from inside the house when they found the drugs on the floor along with the paraphernalia associated with dealing drugs, such as the scales and the razor blades.

The State's theory of the case followed the officers' understanding of Edwards's set-up: Edwards dealt drugs within the house but stored the drugs off premises in the Cadillac's trunk. Edwards used his house and the Cadillac in tandem to sell drugs. Consistent with that theory, a rational factfinder could have reasonably concluded that Edwards kept smaller amounts of cocaine in his house and kept the bulk of his supply nearby in the Cadillac's trunk, where he could access it quickly and easily when needed.

_____

[9]Elsewhere, Officer Dilbeck testified that he told Edwards that he was arresting him for the drugs in the house and in the Cadillac.

Nothing in the record suggested that Edwards personally used cocaine. Absent personal use, in the context of the other evidence, if Edwards possessed drugs, he did so for the purpose of delivery.

Finally, the net weight of the cocaine found in Edwards's home was 0.63 grams. Officer Dilbeck testified that a single use might weigh half a gram. In contrast, Officer Davis stated that users typically had only two-tenths of a gram. Regardless, the amount found inside the house exceeded what was needed for a single use. The amount, standing alone, might not have been the strongest evidence of an intent to deliver, but neither the State nor the factfinder had to rely on the amount alone. Officers Dilbeck and Davis observed Edwards engage in conduct consistent with drug-dealing, and inside the house, they found drugs, drug paraphernalia, and evidence showing how Edwards was converting cocaine into crack cocaine.

Nothing, not even the weight of the drugs found inside the house, suggested that if Edwards was guilty at all, he was guilty only of possessing the cocaine found inside the house. *See Hernandez*, 631 S.W.3d at 123. It is not enough that the jury could disbelieve evidence pertaining to the greater offense. *See Sweed*, 351 S.W.3d at 68. There must be some evidence refuting or negating the greater offense or some evidence that is open to different interpretations. *See id.* Here, the evidence points to possession with the intent to deliver. Nothing refutes the intent to deliver. Nothing

33

is arguably ambiguous about the intent to deliver.[10] *See id.* We hold that the trial court did not err by refusing to submit Edwards's requested instruction.[11] *See Ritcherson v. State*, 568 S.W.3d 667, 670–71 (Tex. Crim. App. 2018) (providing standard).

We overrule Edwards's third issue.

## VI. CONCLUSION

Having overruled Edwards's three issues, we affirm the trial court's judgment.

/s/ Wade Birdwell

Wade Birdwell
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: August 10, 2023

---

[10]To the extent that the jury charge included an instruction on the lesser-included offense of possession of four grams or more but less than two hundred grams of cocaine, the record does not support the submission of that instruction. Both Officers Dilbeck and Davis testified that possession of over four grams of cocaine indicated the possessor was a dealer. In any event, the State approved including that possession-only instruction.

[11]Edwards did not request a lesser-included-offense instruction for possession with the intent to deliver less than one gram of cocaine. That offense would have been a state-jail felony. *See* Tex. Health & Safety Code Ann. § 481.112(b). Although unclear, to some degree, Edwards appears to have tried to sever the cocaine found in the Cadillac from the cocaine found in the house into separate offenses but simultaneously argue that the latter was a lesser-included offense of the former. If that was his argument, the trial court properly denied his requested instruction. *See Hernandez*, 631 S.W.3d at 125.

34